# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PHILIP KURLANDER, M.D.
BAKER HILL HOLDING, a New York
limited liability company, EDWIN M.
STANTON, and STANTON HOLDINGS, LLC,

     Plaintiffs,

v.                              Case No. 8:19-cv-00742-T-02AEP

ROBERT R KAPLAN,
ROBERT R. KAPLAN, JR., and
KAPLAN VOEKLER CUNNINGHAM &
FRANK, PLC,

     Defendants.

_____/

## <u>ORDER GRANTING</u>
## <u>DEFENDANTS' MOTIONS TO DISMISS</u>

     This matter comes to the Court on Defendants' Motions to Dismiss Plaintiffs'

Complaint from Robert R. Kaplan and Robert R. Kaplan, Jr. (collectively "the

Kaplans"), and Kaplan Voekler Cunningham & Frank PLC (the "Kaplan Firm").

Dkts. 19 & 23. Plaintiffs have filed oppositions in response, Dkts. 31 & 33, to which

Defendants have replied, Dkts. 36 & 38. The Court took extensive argument from

counsel at a hearing on these matters on August 7, 2019. The Court grants

Defendants' Motions to Dismiss without prejudice.

## BACKGROUND

The facts alleged here in large part mirror the allegations in a related case, Case No. 8:19-cv-00644-T-02CPT. As there, for purposes of this motion the Court accepts the factual allegations in the Complaint as true.

Mr. Stanton is an experienced real estate professional in the business of acquiring properties for the purposes of government leases. Dkt. 1 ¶¶ 13–15. In 2006, Mr. Stanton began using the legal services of his friend Mr. Kaplan Jr. and Mr. Kaplan Jr.'s law firm, a predecessor entity to the Kaplan Firm, for his real estate investment business. Dkt. 1 ¶ 17. From this point forward Mr. Kaplan Jr. and his father—and partner at the Kaplan Firm—were Mr. Stanton's "go-to attorneys." Dkt. 1 ¶ 19. At some point during this relationship, the Kaplans and Mr. Stanton entered into a fee arrangement where the Kaplans would receive an equal share of the profits for transactions and ventures that they provided legal services for. *Id.* This included Mr. Stanton's new investment vehicle, EMS-CHI, LLC. *Id.* According to the Complaint, This relationship was not memorized in writing nor was Mr. Stanton encouraged to seek outside counsel's opinion regarding this arrangement. *Id.*

In 2012, Mr. Stanton was in the process of acquiring a number of properties but was in need of additional capital. Dkt. 1 ¶ 20. The Kaplans, in addition to providing the legal services related to this acquisition, introduced Mr. Stanton to

another client of theirs, Dr. Kurlander. *Id.* Dr. Kurlander, a medical doctor, was able to provide the capital necessary to fund this project. *Id.*

At this point Dr. Kurlander, Mr. Stanton, and the Kaplans decided to formalize this arrangement—Dr. Kurlander providing financing, Mr. Stanton providing real estate know-how, and the Kaplans providing legal services. Dkt. 1 ¶ 21. Mr. Stanton's investment vehicle EMC-CHI was changed to Holmwood Capital LLC and the four men were made equity partners in the arrangement by an agreement drafted by Mr. Kaplan. Dkt. 1 ¶ 20. The Complaint alleges that the Kaplans never encouraged Mr. Stanton or Dr. Kurlander to pursue outside counsel regarding this arrangement. Dkt. 1 ¶ 22. As the years went on this arrangement sprouted a number of related ventures—all with the goal to acquire property and with the Kaplans providing legal services. Dkt. 1 ¶ 23.

Sometime in 2014 the Kaplans began to push Mr. Stanton and Dr. Kurlander to form a real estate investment trust. Dkt. 1 ¶ 24. Mr. Stanton and Dr. Kurlander acquiesced to an arrangement where the management of the forthcoming real estate investment trust was separated out into an entity called Holmwood Capital Advisors, LLC ("HCA"). Dkt. 1 ¶ 25. HCA was created as a limited liability company, with each of the partners maintaining an equal share of the company. *Id.* The Complaint alleges the Kaplans drafted all corporate documents: including the operating agreement for HCA. *Id.* Then, instead of advising the Plaintiffs to seek independent

counsel, the Kaplans advised the Plaintiffs that the documents were standard and were the way the Kaplans had been drafting similar documents for over twenty-five years. *Id.* The Plaintiffs claim they agreed to these documents at the behest of their counsel, the Kaplans. This venture successfully continued with Dr. Kurlander providing financing, Mr. Stanton acquiring properties, and the Kaplans providing legal services into 2015. Dkt. 1 ¶ 26. Plaintiffs state by the end of its first year in existence HCA had a real estate portfolio worth upward of thirty-million dollars. Dkt. 1 ¶ 26.

The Kaplans then began to push the Plaintiffs toward a new organizational structure. Dkt. 1 ¶ 27. They advised that a new entity should be formed for purposes of taking advantage of Regulation "A" to raise capital. *Id.* The Kaplans pitched this organizational structure as being key to raising capital without becoming a publicly traded company. *Id.* The Kaplans portrayed this legal and strategic advice as being particularly valuable because, in addition to being securities experts, the Kaplans "played a significant role in the enactment of certain legislation involving Regulation 'A'." *Id.*

As set forth in the Complaint, the Plaintiffs and the Kaplans, at the urging of and with the legal advice of the Kaplans, then formed two new entities: HC Government Realty Trust, Inc. ("HC REIT") and HC Government Realty Holdings, L.P. ("HC Holdings"). Dkt. 1 ¶ 28. As arranged by the Kaplans, HC REIT was a

general partner of the operating partnership, HC Holdings, with its limited partners Holmwood Portfolio Holdings LLC ("Holmwood Portfolio") and Holmwood Capital. *Id.* HC REIT was and continues to be managed by HCA pursuant to a management agreement drafted by the Defendants. Dkt. 1 ¶ 29. As alleged, the Kaplans then advised the Plaintiffs that it was imperative that HC REIT have a board of directors that was composed mostly of independent directors. Dkt. 1 ¶ 31. The Kaplans expressed that the board would be helpful in raising capital and would not interfere with the level of control possessed by the Plaintiffs because the board would be "independent" in name only and would be bound to the pre-existing management agreement between HC REIT and HCA. *Id.*

The Plaintiffs agreed to this new arrangement and Dr. Kurlander, Mr. Kaplan, and Mr. Stanton served as directors of HC REIT with four independent directors who were all selected by the Kaplans. Dkt. 1 ¶ 32. In addition to the new board, Mr. Stanton was elected to serve as the chief executive officer, Mr. Kaplan Jr. appointed himself to serve as the president, Mr. Kaplan was elected to serve as secretary, and Dr. Kurlander was elected to serve as treasurer. *Id.* The Complaint alleges for all of the legal advice necessary for these changes to the corporate structure of the ventures, the Defendants received more than $500,000 in attorneys' fees from the Plaintiffs. Dkt. 1 ¶ 35.

After efforts to procure new capital through this structure began to fail, the Kaplans began counseling the Plaintiffs that securing an institutional investor was the only viable option moving forward—seemingly the opposite of their legal advice less than a year earlier. Dkt. 1 ¶ 38–39. To avoid this the Plaintiffs suggested that they could invest additional capital into HCA in exchange for additional equity. Dkt. 1 ¶ 39. At this point the Kaplans explained that this would be impossible because the organizational documents that they drafted and then advised the Plaintiffs to sign contained an anti-dilution provision that they had not pointed out to the Plaintiffs. *Id.* This provision protected the Kaplans' interest in HCA from being diminished. *Id.*

The Plaintiffs allege they were upset at this revelation and then refused to go along with any further business changes proposed by the Kaplans. Dkt. 1 ¶ 39–40. Without help or permission from the Plaintiffs, the Kaplans began to seek an institutional investor for HC REIT and eventually found an investment group principled by Steve Hale (collectively, the "Hale Partnership"). Dkt. 1 ¶ 40. Over the course of several months the Kaplans negotiated with the Hale Partnership concerning a large investment—against the wishes of the Plaintiffs. *Id.* These negotiations resulted in the "Hale Package." *Id.* The Kaplans, at the objection of the Plaintiffs, put down a "good faith" deposit of their personal funds in order to

secure the Hale Package and the Hale Partnership's interest in assuming control over HC REIT. *Id.*

In an effort to avoid losing control of these business ventures, the Plaintiffs put together a competing capital package (the "Baker Hill Package"). Dkt. 1 ¶ 42. The board met to discuss these two competing packages and was deadlocked. Dkt. 1 ¶ 44. The Plaintiffs then approached the Hale Partnership for separate negotiations about a buy-out for the Plaintiffs. Dkt. 1 ¶ 45. The Hale Partnership agreed to redeem the equity interest of the Plaintiffs as part of moving forward with the Hale Package. *Id.* In January 2019, the HC REIT Board approved the terms of this new package, subject to a fairness opinion by an independent investment bank to support the proposed redemption price for the Plaintiffs. *Id.* The independent investment bank review eventually determined that the proposed redemption price was significantly higher than a fair price. Dkt. 1 ¶ 47. This determination was made orally to the independent directors of HC REIT and was only relayed orally by Mr. Kaplan Jr. to the Plaintiffs. *Id.*

On March 11, 2019, an independent director forwarded to the HC REIT Board a memorandum prepared by Elizabeth Watson, the former CFO of HC REIT. According to the Complaint, the Watson memorandum describes in detail why the Hale Package is not favorable for HC REIT, for common stock shareholders, or for any other constituencies. Dkt. 1 ¶ 51. The next day at 10:43

a.m. Mr. Kaplan, on behalf of the HC REIT Board, provided a notice of a meeting of the HC REIT Board set for 11:15 a.m. the following day. Dkt. 1 ¶ 52. This notice was thirty-two minutes more than the minimum required notice under the organization documents. *Id.* According to the meeting agenda—provided to the Plaintiffs later in the day on March 12th—the board would be voting on the Hale package without any buy-out provisions for the Plaintiffs. Dkt. 1 ¶ 53.

The next morning, Mr. Kaplan convened the board meeting, at which Mr. Stanton and all the independent directors appeared. Dkt. 1 ¶ 56. Dr. Kurlander was in surgery and unable to attend; this conflict was relayed to Mr. Kaplan the night before. *Id.* At the meeting Mr. Stanton objected to the short-notice and asked for a continuance in order to allow Dr. Kurlander to attend. Dkt. 1 ¶ 57. This was ignored. Dkt. 1 ¶ 57–58. The board then voted to adopt the Hale Package with Mr. Stanton as the sole dissent. Dkt. 1 ¶ 58.

The Hale Package was then implemented. Dkt. 1 ¶ 58. As a result, the HCA management contract was being terminated, Mr. Stanton and Dr. Kurlander were removed from their executive positions with HC REIT, and the Plaintiffs' equity was significantly diluted. Dkt. 1 ¶ 59–61.

Now, alleging as fact the history recited above, Plaintiffs bring ten causes of action: (1) breach of fiduciary duty; (2) fraud in the inducement; (3) civil conspiracy to defraud; (4) negligent representation; (5) professional malpractice;

(6) fraudulent omission; (7) constructive fraud; (8) violations of Florida's

Deceptive and Unfair Trade Practices Act; (9) Civil RICO; and (10) Civil RICO

conspiracy.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead

sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556

U.S. 662, 678 (2009) (citation omitted). When considering a Rule 12(b)(6) motion,

the court accepts all factual allegations of the complaint as true and construes them

in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282,

1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to

the well-pleaded factual allegations, documents central to or referenced in the

complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358

F.3d 840, 845 (11th Cir. 2004) (citations omitted).

## DISCUSSION

I.        **Choice of Law**

"[A] federal court sitting in diversity will apply the choice of law rules for

the state in which it sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th

Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

As a preliminary matter, a court must characterize what type of legal issue a case

presents. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d

1233, 1240 (11th Cir. 2007). Once that determination has been made, then the court will apply the choice of law rules that apply to that legal issue in the state which it sits. *Id.*

Under Florida law a legal malpractice claim is an action based in tort law. *Cowan Liebowitz & Latman, P.C. v. Kaplan*, 902 So. 2d 755, 758 (Fla. 2005) ("Florida law views legal malpractice as a personal tort . . . ."). While Plaintiffs cite to an opinion by a Florida state intermediate appellate court that holds legal malpractice claims may be brought as contract claims, that case is distinguishable. Dkt. 19 at 6; *Kartikes v. Demos*, 214 So. 2d 86 (Fla. 3d DCA 1968). In that case the Florida court held that a client may bring an action in contract against an attorney "who neglects to perform services he explicitly or implicitly agreed to perform when he agreed to be employed by the client." *Kartikes*, 214 So. 2d at 86–87. Here, the claims relate to allegations of "failing to disclose the Defendants' conflict of interest, inappropriately advising the Plaintiffs to execute documents . . . that were against their best interests" and other related misconduct, not a failure to provide agreed-upon services under a contract. Dkt. 1 ¶ 113. In any event, a more recent opinion by Florida's highest court will control here. *See Cowan Liebowitz & Latman, P.C.*, 902 So. 2d at 758.

As all the parties seem to agree, in Florida "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state

10

which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting the "significant issues" test for actions in tort). The factors that a court considers in determining which state has the most significant relationship are: "a) the place where the injury occurred, b) the place where the conduct occurred which caused the injury, c) the domicil, residence, nationality, place of incorporation, and place of business of the parties, and d) the place where the relationship, if any, between the parties is centered." *Id.* In most situations, the decisive consideration is the state where the injury occurred. *Id.*

Here, the location where the injury occurred is significantly less clear than that of a personal injury tort. While courts applying Florida law have found that malpractice actions occur where the harm was felt, in this case that location is unclear. *See e.g.*, *Cont'l Cas. Co. v. Cura Grp., Inc.*, No. 03-61846-CIV, 2007 WL 9700733, at *5 (S.D. Fla. Jan. 23, 2007). While the legal work was done in Virginia by the two Virginia lawyers—Kaplans, the harm of the alleged malpractice was felt in multiple places because the plaintiffs are domiciled in numerous different locations. Dr. Kurlander is a citizen of New York, Mr. Stanton is a citizen of Florida, Stanton Holdings is a Delaware company with its principal place of business in Florida, and Baker Hill is a New York company with its principal place of business in New York. Dkt. 1 ¶¶ 1-6. Further, all the business

ventures originating from the relationships among the parties—HC REIT, Holmwood Capital Management, Holmwood Capital, etc.—are formed under either Maryland or Delaware law with their principal places of business in Florida. Dkt. 31 at 4; Dkt. 36 at 3.

However, the place of injury is not dispositive when some other state would have a "more significant relationship." *Cont'l Cas. Co.*, 2007 WL 9700733, at *5 (S.D. Fla. Jan. 23, 2007) (citing *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980)). Regardless of whether the place of injury was in Virginia, New York, Florida, or Maryland, Virginia has the most significant relationship with this case.

Looking to the other significant relationship factors, they point to Virginia. *Bishop*, 389 So. 2d at 1001. The defendants performed services and all of the alleged "actionable misconduct" in Virginia. Dkt. 1 ¶¶ 67(a)-(x). While, as mentioned above, the plaintiffs all reside in different places, the Defendants are all based in Virginia. Dkt. 1 ¶¶ 5-6. Whether the relationship between the parties was centered in one place is unclear at this stage; but, the only thing that seems to tie all the parties together is the fact that the Defendants were providing legal services in Virginia.

Even beyond this, Virginia, rather than Florida, has the greater interest in the regulation of the alleged conduct in this case. The Kaplans are two Virginia lawyers who are not admitted to the Florida Bar. Dkt. 1 ¶¶ 5-6. The Kaplan Firm is a Virginia law firm that does not have a Florida office. *Id.* Despite a litany of allegations by the Plaintiffs, there have been no allegations of unauthorized practice of law. As such, Virginia has the greatest interest in its laws being applied in this case. *Bishop*, 389 So. 2d at 1001 (pointing to other factors to consider in a choice of law analysis including "the relative interests of those states in the determination of the particular issue."). Indeed, Plaintiffs refer to the Virginia Rules of Professional Conduct rather than any Florida rules in their Complaint and their response to the Kaplan Firm's Motion to Dismiss to bolster their allegations of misconduct. Dkt. 1 ¶ 64 ("The Kaplans have clearly disregard these obligations and their obligations under the Virginia Rules of Professional Conduct 1.7 and 1.8[.]"); Dkt. 32 at 1-2 ("[T]he Defendants . . . neglected their professional duties owed to the Plaintiffs . . . and lost sight of the boundary lines drawn by the Virginia Rules of Professional Conduct . . . ."). In short, the Complaint and Response seek to set a standard of care based on the Virginia Rules of Professional Conduct. Accordingly, for the claims based on diversity jurisdiction this Court will apply Virginia law.

II.     **<u>Merits of the Claims</u>**

In their Complaint Plaintiffs allege ten different causes of action. The Defendants' Motions to Dismiss argues that most of these claims—all but the professional malpractice claim—fail as a matter of law. The Court will address these claims in turn.

1.  Breach of Fiduciary Duty, Fraud in the Inducement, Negligent Misrepresentation, Constructive Fraud, and Fraudulent Omission

Plaintiffs bring six claims related to alleged misconduct by the Kaplans and the Kaplan Firm in the course of an attorney-client relationship. These claims are breach of fiduciary duty, fraud in the inducement, negligent misrepresentation, constructive fraud, fraudulent omission, and professional malpractice. Defendants argue that since Virginia law views all attorney-client relationships as contractual, all actions for misconduct related to that duty must be brought as legal malpractice claims based in contract law and any claims based in tort must be dismissed. Dkt. 19 at 7–8.

In Virginia actions for breach of duties attendant to an attorney-client relationship arise only under contract law. *Oleyar v. Kerr*, 225 S.E.2d 398, 400 (Va. 1976) ("[A]n action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract and thus governed by the statute of limitations applicable to contracts."). Therefore, any torts committed in the course of an attorney-client relationship must be

brought as breaches of the contractual duties—whether express or implied—of the lawyer because the contract is the sole source of duty in the relationship. *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 295 (Va. 2007) (dismissing a redundant tort claim because "[b]ut for the existence of the [contract], [the defendants] would [not] have owed any fiduciary duty to [the plaintiffs]."). Any tort claims based on breaches of duties owed solely because of the attorney-client must be dismissed. *See, e.g.*, *Delavan v. Simons*, 94 Va. Cir. 507 (Va. Cir. Ct. 2016) (dismissing claims for breach of fiduciary duty and constructive fraud as being improperly brought as separate torts from the contractual legal-malpractice claim); *see also Atlas Partners II, Ltd. P'ship v. Brumberg, Mackey & Wall, PLC*, No. 4:05CV00001, 2006 WL 42332, at *8 (W.D. Va. Jan. 6, 2006) (dismissing claims for breach of fiduciary duty and fraud for the same reasons).

But if a claim is based on a duty that is independent from the duty owed in an attorney-client relationship then a plaintiff may bring it as a separate tort claim. Where the attorney breaches a duty that is independent of his or her status as attorney, then the attorney is liable in tort for those actions just as any other individual would. *See Foreign Mission Bd. v. Wade*, 409 S.E.2d 144, 148 (Va. 1991). For example, despite the contractual relationship, a client could bring a tort action against her attorney for a fender-bender in the courthouse parking lot caused by the attorney. The duty owed in this situation is separate from the duty created

by the contractual relationship and can be brought as a separate tort. *See Goodstein v. Weinberg*, 245 S.E.2d 140 (Va. 1978) (noting that where an attorney's alleged breach "amounts to an independent, willful tort, . . . the plaintiff has a right to elect whether he will proceed in tort or upon the contract.").

First, the claim for breach of fiduciary duty is subsumed by the contractual professional malpractice claim. The attorney-client relationship is based on a fiduciary duty. *See Stockton v. Ford*, 52 U.S. 232, 247 (1850) ("There are few business relations of life involving a higher trust and confidence than those of attorney and client . . . ."). Therefore, a breach of this duty is properly a breach of contract claim and cannot be brought as a tort claim unless there is an independent fiduciary duty. *O'Connell v. Bean*, 556 S.E.2d 741, 743 (Va. 2002); *see, e.g.*, *Gen. Sec. Ins. Co. v. Jordan, Coyne & Savits, LLP*, 357 F. Supp. 2d 951, 962 (E.D. Va. 2005). Plaintiffs do not allege a source independent of the contractual attorney-client relationship and therefore the claim is redundant to Count V. In their Response to the Motion to Dismiss, the Plaintiffs point to Florida cases that suggest there are separate avenues for breach of fiduciary duty claims within a malpractice situation; however, as discussed above, Virginia law controls. Accordingly, Count I must be dismissed.

Second, the claim for fraud in the inducement is not based on a duty independent of the duty owed in a attorney-client relationship and therefore is also

subsumed by the professional malpractice claim. Plaintiffs allege that "[t]he Defendants only obtained the Plaintiffs' agreement to the numerous operational documents drafted by the Defendants for Holmwood Capital and HCA, as well as the procuring the Reg A securities offering and formation of HC REIT and HC Holdings, by knowingly making misstatements of the contents of the certain operational documents and viability of the Reg A scheme." Dkt. 1 ¶ 81. The only reason that Defendants were in any position to present these agreements and make these alleged misrepresentations is because Defendants were Plaintiffs' "go to legal counsel." Dkt. 1 ¶ 84. There is no independent duty here, so this claim is redundant. *See Foreign Mission Bd.*, 409 S.E.2d at 148. Therefore, Count II is subsumed by the claim for professional malpractice and must be dismissed. *See Augusta Mut. Ins. Co.*, 645 S.E.2d at 295.

Third, the claims for negligent misrepresentation and constructive fraud are both subsumed. Virginia law views claims for negligent misrepresentation and constructive fraud as the same cause of action. *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998) ("The essence of constructive fraud is negligent misrepresentation."). And, this cause of action—whether appropriately labeled as negligent misrepresentation or constructive fraud—is based on the duty arising from the attorney-client relationship. In both Counts, Plaintiffs allege that the misrepresentations and fraudulent statements were made in the course of the

Defendants' role as the Plaintiffs' "go to legal counsel" and the "past and ongoing attorney-client relationship." Dkt. 1 ¶¶ 102 & 127. As such, neither Count is based on an independent duty and is therefore redundant to the breach of contract claim for professional malpractice and must be dismissed. *See, e.g.*, *Delavan v. Simons*, 94 Va. Cir. 507 (Va. Cir. Ct. 2016) (dismissing a claim for constructive fraud as being improperly brought as a separate tort from the contractual legal-malpractice claim).

Finally, this Court is unable to determine the elements for a claim of "damages for fraudulent omission" under Virginia law. Nevertheless, this Count will also be rendered redundant by the professional malpractice claim. Plaintiffs allege that "[t]he Kaplans had a clear duty to inform their clients . . . of the conflict of interest," "the Kaplans had the duty to inform the Plaintiffs that Reg A was not a viable option, prior to extracting more than $500,000 in legal fees from the Plaintiffs," and "[t]he Kaplans had a duty to inform . . . [their clients] of the many pitfalls the Kaplans surreptitiously drafted into the organizational documents." Dkt. 1 ¶ 120–21. Each of these allegations is based on a duty that arises squarely from the attorney-client relationship between the parties. As such, Count VI must be dismissed as well. *See Augusta Mut. Ins. Co.*, 645 S.E.2d at 295.

In sum, each of the Plaintiffs' claims related to misconduct in the course of the legal relationship between the parties can only be brought as breaches of the

attorney-client contractual relationship. Accordingly, Counts I, II, IV, VII, and VI must be dismissed. The only claim related to the attorney-client relationship between the Defendants and the Plaintiffs that stands properly as a contract claim is the claim for professional malpractice. However, that claim too must be dismissed.

2.     Professional Malpractice

A cause of action for legal malpractice has three separate elements: 1) the existence of an attorney-client relationship creating a duty; 2) a breach of that duty by the attorney; and 3) damages proximately caused by the attorney's breach of duty. *Shipman v. Kruck*, 593 S.E.2d 319, 322 (Va. 2004). An attorney-client relationship may be either expressly or impliedly created. *Nicholson v. Shockey*, 64 S.E.2d 813, 817 (Va. 1951). A proximate cause is an act that, "unbroken by a superseding cause, produces a particular event and without which that event would not have occurred." *Williams v. Joynes*, 677 S.E.2d 261, 264 (Va. 2009).

Plaintiffs have not adequately alleged facts related to the damages proximately caused by the Defendants' alleged misconduct. Plaintiffs merely allege that "[a]s a direct and proximate result of the Defendants' breaches of their duties as identified above, the Plaintiffs were ultimately damaged, losing profits and incurring other business and opportunity costs." Dkt. 1 ¶ 114. While Plaintiffs

are not required to make "detailed factual allegations," there must be more in the

complaint than "[t]hreadbare recitals of the elements of the cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs have not alleged how the

damages were proximately caused. As such, the claim for professional malpractice

must be dismissed as inadequately pled.

3.    Civil Conspiracy to Defraud

Next, Plaintiffs bring an action against all of the Defendants for civil

conspiracy to defraud. Defendants argue that this claim is barred as a matter of law

because Virginia law recognizes intracorporate conspiracy immunity. Plaintiffs

rebut that this exception does not apply here.

Under Virginia law, in order to have a conspiracy there must be two or more

persons or entities. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va.

1985). A single business entity, like a single person, cannot conspire with itself. *Id.*

Thus, as a matter of law, in order to state a claim for conspiracy a plaintiff must

allege the existence of two or more entities.

Here, Plaintiffs fail to allege the existence of more than one legal entity. The

Kaplans are partners at the Kaplan Firm, a professional limited company. Dkt. 1 ¶¶

6 & 18. Plaintiffs never allege that the Kaplans were acting outside of their roles as

partners at the Kaplan firm. In fact, they allege that "the conduct of the Kaplans

was authorized by or subsequently acquiesced in by the Kaplan Firm." *Id.* ¶ 144. The Kaplans acting in their roles as partners of the Kaplan Firm cannot conspire with the Kaplan Firm because they are a single legal entity. *Bowman*, 331 S.E.2d at 801.

Plaintiffs argue that this doctrine is inapplicable because the individual Defendants in this case acted to serve their own personal interests, independent from that of the Kaplan Firm. Dkt. 31 at 15. Plaintiffs argue that the independent personal-stake exception to intracorporate conspiracy immunity allows them to bring conspiracy claims against the Defendants because they acted as two entities. *Id.* This exception is applicable "when the officer has an independent personal stake in achieving the corporation's illegal objective." *Greenville Publ'g. Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974).

Yet, the Defendants' stake in the alleged conspiracy—albeit personal—was not independent from the stake of the Kaplan Firm. The Kaplans acted as lawyers to the Defendants and collected fees which presumably went to the Kaplan Firm. While the Kaplans' legal work resulted in the Kaplans gaining individual roles in the various business ventures, this is personal but not independent. Both would benefit from the continued legal work by the Kaplans and the continued collection of fees from that work. Adopting the interpretation of the exception that Plaintiffs argue would render the word "independent" meaningless. In any event, Virginia

has not adopted the independent personal-stake exception. *Hiers v. Cave Hill Corp.*, 51 Va. Cir. 208 (2008); *see also Mician v. Catanzaro*, No. 2:17–cv–548, 2018 WL 2977398, at *5 n.3 (E.D. Va. June 13, 2018). For these reasons, Plaintiffs' claim against Defendants for civil conspiracy to defraud must be dismissed.

4.    Florida Deceptive and Unfair Trade Practices Act

Plaintiff also brings an action against the Kaplans for violations under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Dkt. 1 ¶ 130. Plaintiffs argue that the Kaplans "engaged in unconscionable, unfair and deceptive acts or practices." Dkt. 1 ¶ 132. The Kaplans argue that none of the Plaintiffs— save for Mr. Stanton—have standing to bring claims under FDUTPA because they are not citizens of the state of Florida. Plaintiffs' claims must be dismissed, however not for that reason.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1) (2019). The law is intended to protect the public from "unfair acts or practices" and unfair methods of competition, "in the conduct of any trade or commerce." *See id.* § 501.202(2). A practice is "unfair" under FDUTPA when it "offends established public policy" or is "immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

Attorneys are not per se exempt from FDUTPA. *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1371 (S.D. Fla. 2010) However, the practice of law normally does not satisfy the elements necessary to bring a claim under FDUTPA. *Id.* The key missing element is that FDUPTA only protects against unfair acts or practices in the "conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id.* § 501.203(8). Despite this broad definition, conduct by a law firm or lawyers during the provision of legal services is not "trade or commerce" and is instead the exercise of a legal remedy. *CK Regalia, LLC v. Thornton*, 159 So. 3d 358, 360 n.2 (Fla. 3d DCA 2015); *State, Office of Atty. Gen. v. Shapiro & Fishman, LLP*, 59 So. 3d 353, 357 (Fla. 4th DCA 2011); *see also Kelly*, 681 F. Supp. 2d at 1374–77 (noting that the practice of law is "conduct ostensibly occurring during the exercise of a legal remedy [and has] zero connection whatsoever to any 'trade or commerce'"). Accordingly, the practice of law is not considered trade or commerce, meaning FDUTPA does not apply.

Here, Plaintiffs allege that the Kaplan's conduct "occurred in the conduct of trade and commerce." Dkt. 1 ¶ 138 Yet, all of the allegations in the Complaint relate to conduct occurring in the course of legal representation. Plaintiffs allege that the Kaplans made "deceptive representations" in the course of legal advice and "continuous[ly] fail[ed] to disclose" pertinent information in the course of legal advice. Dkt. 1 ¶ 133. Plaintiffs' entire Complaint is based on the premise that the Kaplans engaged in misconduct during the course of legal representation. *See* Dkt. 1 ¶ 63. These acts are not "in the conduct of any trade or commerce" within the definition of the statute and thus Plaintiffs' FDUTPA claim fails as a matter of law.

5.   Racketeer Influenced and Corrupt Organizations Act

Finally, Plaintiffs allege that the Kaplans violated 18 U.S.C. § 1962(c) ("RICO") & 1962(d) ("RICO conspiracy"). The RICO statute makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To state a claim for RICO, a plaintiff must allege: 1) a conduct; 2) related to an enterprise; 3) through a pattern; 4) of racketeering activity. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).

To establish a valid enterprise to sustain RICO liability, a plaintiff must prove that each party to the enterprise is separate and distinct from the other. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes . . . ." *Williams*, 465 F.3d at 1284. A RICO claim depends on proving that the defendants participated in the conduct of the "enterprises affairs, not just their own affairs." *Cedric Kushner Promotions, Ltd,* 533 U.S. at 163.

Further, in order to be liable under RICO the defendant must have participated in the operation or management of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . but some degree in directing the enterprise's affairs is required." *Id.*

The Plaintiffs are unable to state a claim for RICO because there is not an enterprise here. Plaintiffs allege that "the conduct of the Kaplans was authorized by or subsequently acquiesced in by the Kaplan Firm." Dkt. 1 ¶ 144. Accepting this allegation as true, the Kaplans were acting in their capacity as lawyers at the Kaplan Firm. As such, there cannot have been an enterprise because there was only one party and therefore, they were merely conducting their own affairs. Even if the

Kaplans were operating an enterprise, providing legal services does not rise to "operation or management of the enterprise itself." *Design Pallets, Inc. v. Gray Robinson, P.A.*, No. 6:07-cv-655-Orl-31KRS, 2008 WL 3200275, at *5 (M.D. Fla. Aug. 5, 2008) (holding allegations that a law firm that drafted strategy memos, board meeting agendas, and various other documents were insufficient to show that law firm did anything more than act as legal counsel).

In terms of the allegations related to RICO conspiracy, in order to state a claim a plaintiff must allege either: 1) agreement by the defendant to the overall objective of the conspiracy or 2) that the defendant agreed to commit two predicate acts. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir.2010). While nearly all of the circuits have found that if a plaintiff fails to state a claim of a primary RICO violation, the plaintiff's RICO conspiracy claim necessarily fails, the Eleventh Circuit has not addressed this issue. *Am. Dental Ass'n*, 605 F.3d at 1296 n.6. However, this Court need not take a position on this issue here.

There is a long and robust line of cases that reject RICO claims against lawyers who were lawyering. The Plaintiffs would do well to consider this line carefully before thinking about repleading RICO on these facts. Real criminal acts do not appear present here.

Plaintiffs' allegations with respect to conspiracy to commit a RICO violation fail as a matter of law because the primary RICO violations fail and Count X does not contain any additional factual allegations. *Id.* ("[W]here a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails." (citations omitted)). Plaintiffs merely allege that the Kaplans "did at all times enter into an agreement and conspire with each other and the Kaplan Firm to conduct to participate in the affairs of the racketeering enterprise" and that they committed "at least two predicate acts of racketeering." Dkt. 1 ¶ 150. This allegation contains no more than those contained in the primary RICO count—which fails as a matter of law. As such, both RICO claims (Counts IX and X) must be dismissed.

### III. <u>Federal Rules of Civil Procedure Rule 8</u>

In federal court a complaint must be a "short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). Defendants move to dismiss the Complaint for being a "shotgun pleading," or in other words, for failing "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests" or being "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). However dismissal is only necessary where the

defendant is unable to frame a responsive pleading. *Lampkin-Asam v. Volusia Cty. Sch. Bd.*, 261 F. App'x 274, 277 (11th Cir. 2008).

Some of the counts in the Complaint are better pled than others. Each count realleges by reference the factual paragraphs of the Complaint. However, some counts reallege the twenty-four instances of "actionable misconduct" (Dkt. 1 ¶¶ 67(a)-(x)) wholesale; it is thus unclear which portions of the actionable misconduct apply to which counts. The remainder of the counts plead mere legal conclusions. However, since this Court has already addressed the merits of the Defendants' Motions to Dismiss, there is no need to address whether Plaintiffs' Complaint violated Rule 8 of the Federal Rules of Civil Procedure.

## CONCLUSION

The Court grants Defendants' Motions to Dismiss, Dkts. 19 & 23, without prejudice. Plaintiffs shall have twenty (20) days to file an amended complaint consistent with this Order.

**DONE AND ORDERED** at Tampa, Florida, on August 21, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record