## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PHILIP KURLANDER, M.D., an individual
BAKER HILL HOLDING, LLC, a New York
limited liability company, EDWIN M. STANTON,
an individual, and STANTON HOLDINGS, LLC, a
Delaware limited liability company,

        Plaintiffs,                Case No. 8:19-cv-742-T-02AEP

v.

ROBERT R. KAPLAN, an individual, ROBERT R.
KAPLAN, JR., an individual, and KAPLAN
VOEKLER CUNNINGHAM & FRANK PLC, a
Virginia professional limited liability,

        Defendants.

_____/

## ORDER

Plaintiffs Philip Kurlander ("Kurlander"), Baker Hill Holdings, LLC ("Baker Hill"), Edwin M. Stanton ("Stanton"), and Stanton Holdings, LLC ("Stanton Holdings"), sue Defendants, Robert R. Kaplan ("Kaplan"), Robert R. Kaplan, Jr. ("Kaplan Jr."), and the law firm of Kaplan, Voekler, Cunningham & Frank, PLC (the "Kaplan firm") for legal malpractice, breach of fiduciary duty, fraud, fraud in the inducement, civil conspiracy to defraud, negligent misrepresentation, fraudulent omission, and constructive fraud. (Dkt. 43). Before the Court are Defendants' motions to dismiss (Dkts. 44, 45) the Amended Complaint, Plaintiffs' responses in

opposition (Dkts. 48, 49), and Defendants' replies (Dkts. 50, 51). For the reasons that follow, Defendants' motions (Dkts. 44, 45) are granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the Court accepts the factual allegations in the Amended Complaint as true. Plaintiff Kurlander and his spouse are citizens of New York and are the sole two members of Baker Hill, a limited liability company with its principal place of business in the State of New York. (Dkt. 43 ¶¶ 1–2). Plaintiff Stanton is a Florida citizen and the sole member of Stanton Holdings, a Delaware limited liability company with its principal place of business in Florida.[1] *Id.* ¶¶ 3–4. Defendants Kaplan and Kaplan Jr. (collectively "the Kaplans") are father and son who are lawyers and citizens of Virginia. *Id.* ¶¶ 5–6. The Kaplan firm is a limited liability law firm with its principal place of business and citizenship in Virginia. *Id.* ¶ 6. The Kaplans have ownership interests in business entities in Florida and have listed their personal addresses as being in the State of Florida in documents associated with these corporate holdings. *Id.* ¶ 5. The Kaplans are principals in the Kaplan Firm. *Id.* ¶ 6. The various professionals of the Kaplan firm have placed telephone calls to Florida, sent emails that arrived in Florida, mailed documents to

---

[1] Kurlander, Stanton, Baker Hill, and Stanton Holdings are collectively referred to as "Plaintiffs."

Florida, sent and received wires from Florida, and immersed themselves in business entities in Florida. *Id.*

Stanton and Kurlander are intelligent and accomplished individuals. *Id.* ¶ 13. Kurlander is an anesthesiologist whose medical practical consumes most of his time, but he is also a sophisticated investor. *Id.* Stanton has a Master's in Business Administration and previously worked with a large private real estate investment company where he developed skills, contacts, and significant relationships related to commercial real estate transactions. *Id.* ¶ 14. Neither Stanton nor Kurlander have any legal training. *Id.* ¶ 13. After being a part of a larger organization, Stanton branched off with co-workers and cofounded SRS Investments ("SRS"), a private equity real estate investment firm based in Sarasota, Florida. *Id.* ¶ 15. During the early stages of SRS's existence, Stanton met Kaplan Jr. and his then law partner Chris Hoctor, who were partners in a predecessor firm to the Kaplan Firm. *Id.* ¶ 16. Stanton and Kaplan Jr. became social friends. *Id.*

Under Stanton's leadership and business acumen, SRS was successful in completing numerous real estate acquisitions and developed an emerging reputation in the industry. *Id.* ¶ 17. Although Stanton initially rejected Kaplan Jr.'s advances to provide legal work for SRS, eventually Stanton acquiesced and he moved SRS's real estate and securities work to Kaplan Jr. and the Hoctor Kaplan (HK) law firm. *Id.* Kaplan engaged in an attorneys' fee arrangement that was undocumented, unwritten,

and unsigned. *Id.* Stanton trusted Kaplan Jr., and nothing about an undocumented representation relationship appeared to Stanton to be inappropriate. *Id.* ¶ 18. At no time did Kaplan Jr. ever disclose the existence or possibility of a conflict in the representation. *Id.* From 2006 until the filing of the Complaint, Kaplan Jr. and his firm acted as the exclusive real estate, corporate, and securities attorneys for Stanton and his various Florida-based entities. *Id.* ¶ 19. For a four-year period during this time frame, Stanton lived in Chicago, and Kaplan Jr. served as his counsel for all personal and business matters. *Id.* at 6 n.5.

During this time, Stanton considered the Kaplans and their respective firm to be his "go to" attorneys. *Id.* ¶ 20. Because the Kaplans' billing practices were extremely aggressive compared to Stanton's prior California law firm, the Kaplans offered to resolve the fee sensitivity issue by proposing "split profit deals" in which Kaplans would provide legal services in exchange for a share of the profits. *Id.* ¶ 20. To accomplish this arrangement, EMS-CHI was formed as a special purpose equity ("SPE") to acquire an asset as part of this undocumented venture between Stanton and the Kaplans. *Id.* Stanton and the Kaplans verbally agreed that Stanton would source acquisitions and acquire financing and the Kaplans would provide all legal services in exchange for an equal share of the profits when the properties were sold. *Id.* Plaintiffs allege this agreement was not documented in writing. *Id.*

At the end of 2009, Kaplan Jr. began involving his father in his representation of Stanton and his entities. *Id.* ¶ 21. The elder Kaplan holds himself out as an experienced securities lawyer. *Id.* In 2012, Stanton needed both capital and legal representation. *Id.* ¶ 22. To assist with the financing, the Kaplans involved their client Kurlander who had ample access to capital. *Id.* The Kaplans continued to offer their legal representation in exchange for a share of the profits. *Id.* A second property was acquired with traditional financing and a loan provided by Kurlander. *Id.* The Kaplans represented all parties in the transaction. *Id.* Kurlander converted his loan into equity and committed additional equity to the growth of the portfolio. *Id.* The EMS-CHI entity changed to Holmwood Capital. *Id.*

Holmwood Capital was a Delaware company with its principal place of business in Sarasota, Florida. *Id.* ¶ 23. Kaplan drafted an operating agreement that attempted to formalize the relative equity positions of Stanton, Kurlander, and the Kaplans. *Id.* Kaplan provided all of the legal advice and drafting, never advising Plaintiffs to seek independent counsel. *Id.* At this point in time, Stanton had a trusted attorney-client relationship with Kaplan Jr. for nearly five years. *Id.*

A third SPE was formed to acquire a third property, with the Plaintiffs being represented by the Defendants. *Id.* ¶ 24. The representation was undocumented, and again, according to Plaintiffs, the Kaplans did not disclose any potential conflict of interest. *Id.* As time passed, Plaintiffs and Defendants became involved in a business

that involved a conglomerate of business entities, all operating as a single common venture ("the Venture"). *Id.* ¶ 25. The real estate acquisitions Stanton sourced were all commercial real estate properties subject to long-term leases with federal government tenants. *Id.*

In 2014 Defendants convinced Plaintiffs to transform the structure of Holmwood Capital to that of a real estate investment trust (REIT). *Id.* ¶ 26. Defendants also advised Plaintiffs that the management of the REIT should be handled by a separate entity. *Id.* ¶ 27. Plaintiffs acquiesced and Holmwood Capital Advisors LLC ("HCA") was formed in July 2014, with Stanton, Kurlander, Kaplan, and Kaplan Jr. (collectively "the Partners") each having a 25% share *Id.* All corporate documents were drafted by the Kaplans. *Id.* By the end of 2015, Holmwood Capital had a seven-property portfolio. *Id.* ¶ 28.

Throughout this time, Defendants held themselves out as securities experts, having played a significant role in the enactment of certain legislation involving Regulation "A". *Id.* ¶ 29. The Kaplans recommended that a new entity be formed for purposes of taking advantage of Regulation "A" to raise capital. *Id.* As explained by the Kaplans, qualification of an offering under Tier II of Regulation "A" enables small business entities to raise capital without the full burden of being a publicly listed company. *Id.* To that end, two new entities were formed—HC Government Realty Trust, Inc. ("HC REIT") and HC Government Realty Holdings, L.P. ("HC

Holdings"). *Id.* ¶ 30. HC REIT and Holmwood Capital owned and controlled HC Holdings. *Id.* As structured by the Kaplans, HC REIT was the general partner of the operating partnership, HC Holdings, with its limited partners Holmwood Portfolio Holdings LLC ("Holmwood Portfolio") and Holmwood Capital. *Id.* ¶ 31. Kurlander agreed to the formation of HC Holdings and HC REIT with the understanding that his fifty percent interest would provide him with significant voting control. *Id.* ¶ 32. However, Kurlander's equity interest stemming from his 80% control of Holmwood Capital was non-voting and converted to "OP Units," the effect of which was he lost control because of the conversion that the Kaplans counseled him to agree to. *Id.*

The Kaplans also advised Kurlander and Stanton that a board of directors was necessary, including a majority of the board being independent. *Id.* ¶ 33. Stanton and Kurlander hesitantly agreed, with Kurlander, Kaplan and Stanton serving as directors of HC REIT along with four independent directors. *Id.* ¶ 34. Independent directors were primarily sourced by the Kaplans. *Id.* As leadership of HC REIT, Stanton was elected chief executive officer, Kaplan Jr. appointed himself president, Kaplan was secretary, and Kurlander was treasurer. *Id.*

On November 7, 2016, the Securities and Exchange Commission ("SEC") approved the qualification of the HC REIT's Reg "A" securities offering. *Id.* ¶ 35. HC REIT thereafter began marketing the sale of its common stock securities. *Id.* ¶ 36. All legal advice provided by the Kaplans to the Plaintiffs was oral, and Plaintiffs

allege that at no point did the Defendants ever provide an invoice, engagement letter, or other document memorializing the representation relationship. *Id.* ¶ 38. Defendants received more than $500,000 in attorneys' fees associated with their legal counseling in the creation of Holmwood Capital, HC REIT, and HC Holdings. *Id.* ¶ 37.

When HC REIT was first formed, Kaplan Jr. represented he had the experience, background, and contacts to head up the equity-raising component. *Id.* ¶ 40. Given Kaplan Jr.'s shortfalls in this area, the Plaintiffs agreed it was necessary for HC REIT to hire an independent third-party consultant to locate and negotiate broker-dealer relationships that were needed to grow the Venture. *Id.* ¶ 41. Within twelve months, the Kaplans began counseling the Plaintiffs that Reg "A" was a "dead end" and an institutional investor was the way to go. *Id.* ¶¶ 41–42. Plaintiffs expressed interest in investing additional capital into HCA in exchange for additional equity, but they learned that the organizational documents included an anti-dilution policy that precluded dilution of the Kaplans' interests. *Id.* ¶ 42.

The Kaplans sought an institutional investor and ultimately negotiated a deal with a set of investors led by Steve Hale. *Id.* ¶ 43. The Kaplans put down a "good faith" deposit with their own personal funds for a deal with the Hale Partnership in order to acquire the "Hale Package" and the Hale Partnership's interest in assuming control over the Venture, which Plaintiffs opposed. *Id.* The Kaplans called a meeting

of the HC REIT Board to discuss the Hale Package. Kurlander had submitted, through Stanton, an alternative capital proposal referred to as the "Baker Hill Package." *Id.* ¶ 45. The HC REIT Board was deadlocked regarding the Hale Package versus the Baker Hill Package. *Id.* ¶ 48. Given the deadlock, Kurlander and Stanton entered into separate negotiations with Hale, ultimately agreeing to the "Agreed Hale Package." *Id.* ¶ 49.

An investment bank was engaged to render the fairness opinion and purportedly an initial fairness opinion resulted in a share price significantly below the agreed repurchase share price of $9.10. *Id.* ¶ 51. Stanton and Kurlander rejected the proposed reduced share price. *Id.* ¶ 53. A lengthy memorandum prepared by Elizabeth Watson, the former CFO of HC REIT (the "Watson Memorandum") explains in detail why the Hale Package is not favorable for HC REIT or for common stockholders and was forwarded to the HC REIT Board on March 11, 2019. *Id.* ¶ 55. The Kaplans did not disclose the Watson Memorandum despite Kaplan Jr. receiving it a week prior. *Id.*

On March 12, 2019, at 10:43 a.m., Kaplan provided notice of a meeting of the HC REIT Board to take place on March 13, 2019, at 11:15 a.m. *Id.* ¶ 56. On the evening of March 12, 2019, Kaplan emailed a 121-page agenda for the next day's meeting. *Id.* ¶ 57. Among other matters, authorizing and finalizing the Hale Package, terminating Stanton as CEO of HC REIT, and terminating Kurlander as treasurer,

were on the disputed agenda. *Id.* ¶ 58. The meeting took place at 11:15 a.m. on March 13, 2019, with Stanton, Kaplan, and the independent directors appearing personally or telephonically. *Id.* ¶ 60. Kurlander, who was in surgery, was unable to attend. *Id.* Stanton requested a continuance of the meeting given Kurlander's unavailability and the short notice provided for the meeting. *Id.* ¶ 61. No continuance was permitted, and the HC REIT Board proceeded to vote and approve all items presented for consideration with Stanton being the only dissenter. *Id.* ¶ 62. The Hale Partnership immediately acted to disband the HC REIT Board and elect three others to the now vacant Board positions; Kaplan Jr. remained on as president of HC REIT. *Id.* ¶ 64.

Plaintiffs allege the Kaplans violated the rules regulating the Florida Bar and, to the extent Virginia law applies, the Virginia Rules of Professional Conduct by failing to explain the inherent conflicts of trading legal services for equity in business ventures and representing all parties involved. *Id.* ¶¶ 68–70. Plaintiffs claim damages as a result of the Kaplans' splitting profits in real estate transactions, the termination of promised legal services, failure to obtain requisite insurance, concealing provisions in drafted documents that favored Defendants over Plaintiffs, failing to maintain corporate documents, endorsing the Hale Package to Plaintiffs' detriment, and employing abusive billing practices. *Id.* ¶ 72. As a result of Defendants' alleged actionable conduct, Plaintiffs claim they have been improperly billed approximately

$1,500,000 in legal fees and Defendants acquired several significant unearned investments in the Venture.  *Id.* ¶ 77.

Plaintiffs sue Defendants for professional malpractice (Count I), breach of fiduciary duty (Count II), fraud (Count III), fraud in the inducement (Count IV), civil conspiracy to defraud (Count V), negligent misrepresentation (Count VI), fraudulent omission (Count VII), and constructive fraud (Count VIII).  (Dkt. 43 at 45–63).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a Rule 12(b)(6) motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted).

## DISCUSSION

### I.    Choice of Law

"[A] federal court sitting in diversity will apply the choice of law rules for the state in which it sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir.

2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). As a preliminary matter, a court must characterize what type of legal issue a case presents. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Once that determination has been made, then the court will apply the choice of law rules that apply to that legal issue in the state which it sits. *Id.*

Under Florida law, a legal malpractice claim is an action based in tort law. *See Cowan Liebowitz & Latman, P.C. v. Kaplan*, 902 So. 2d 755, 758 (Fla. 2005) ("Florida law views legal malpractice as a personal tort . . . ."). As all the parties seem to agree, in Florida "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting the "significant issues" test for actions in tort). The factors that a court considers in determining which state has the most significant relationship are: "a) the place where the injury occurred, b) the place where the conduct occurred which caused the injury, c) the domicil, residence, nationality, place of incorporation, and place of business of the parties, and d) the place where the relationship, if any, between the parties is centered." *Id.* In most situations, the decisive consideration is the state where the injury occurred. *Id.* The Court's analysis does not stop there, however, as the Court

must also consider additional policy considerations that underlie the choice-of-law test.

The Court has previously undertaken a choice-of-law analysis in this case and concluded that Virginia law applies. *See* Dkt. 40 at 9–13. Seemingly taking issue with this conclusion, Plaintiffs include in their Amended Complaint new allegations purporting to demonstrate more significant relationships between the State of Florida and the disputes here. *See, e.g.,* Dkt. 43 ¶¶ 5, 6, 9, 17, 78. Plaintiffs argue that Stanton and his businesses are located in Florida, communications were received in Florida, and several of the business entities involved have their principle place of business in Florida. As the Amended Complaint reveals, however, Stanton lived for at least four years during the relevant time frame in Chicago, and as previously noted, Kurlander is a citizen of New York and Baker Hill is a New York company with its principal place of business in New York. Thus, the citizenship of the Plaintiffs does not necessarily support more significant relationships in Florida versus other jurisdictions.[2]

Plaintiffs argue the "center of the parties' relationship" was focused in Florida, and that Florida has a strong interest in compensating its citizens for injuries

---

[2] Although none of the parties argue the applicability of Delaware law to the claims pled, at least one management agreement attached to the Amended Complaint references Delaware law. (Dkt. 43-14 at 26). This counters an expectation that only Florida law would govern the parties' interactions.

to its legal consumers. Based on the Amended Complaint, however, the largest financial contributor appears to have been Kurlander, a New York citizen. Thus, it is apparent that Florida was not the only State whose citizens suffered damages.

As conceded by Plaintiffs, a state has an obvious interest in regulating the conduct of its licensed professionals. The Kaplans are Virginia citizens and members of the Virginia Bar. They are not licensed to practice law in Florida, and there has been no claim of the unauthorized practice of law. The Kaplan firm is a Virginia law firm that does not have offices in Florida. The gravamen of Plaintiffs' claims is the Plaintiffs' dissatisfaction with the legal advice provided by Defendants regarding real estate and business transactions and the failure of Defendants to disclose potential conflicts of interest associated with the transactions and the parties' business relationships. The actionable conduct by these Virginia lawyers occurred in Virginia. Virginia, rather than Florida, has the greater interest in regulating the alleged misconduct of its lawyers. *See, e.g., Reichard v. Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A.*, No. 18-CV-61128, 2018 WL 5016285, at *6 (S.D. Fla. Oct. 16, 2018), *aff'd sub nom. Reichard v. Henderson Covington Messenger Newman & Thomas Co.*, 779 F. App'x 665 (11th Cir. 2019) (finding that "while Florida has a strong interest in protecting its citizens from professional negligence by attorneys, its interest in regulating out-of-state conduct by out-of-state attorneys must yield to Ohio's interest in regulating its own attorneys' conduct");

*LNC Inv., Inc. v. First Fidelity Bank, Nat'l Assoc.*, 935 F. Supp. 1333, 1350–51 (S.D.N.Y. 1996) (citations omitted) (finding a "state has a strong interest in regulating the conduct of a law firm licensed to practice within its borders").

Accordingly, the Court applies Virginia law to Plaintiffs' claims.

## II.     Plaintiffs' Claims

In their Amended Complaint, Plaintiffs again assert a plethora of claims against Defendants arising out of the business and legal relationships between Plaintiffs and Defendants.  As this Court previously recognized, under Virginia law, such claims related to misconduct in the course of an attorney-client relationship may only be brought as a breach of contract claim, and not in tort, unless based on an independent duty.  (Dkt. 40 at 14–20).

### A.     *Count I – Professional Malpractice*

In Virginia, a claim for legal malpractice "requires the existence of an attorney-client relationship which gave rise to a duty, breach of that duty by the defendant attorney, and that the damages claimed by the plaintiff client must have been proximately caused by the defendant attorney's breach." *Smith v. McLaughlin*, 769 S.E.2d 7, 13 (2015) (internal quotation marks and citations omitted). Plaintiffs have alleged the existence of an attorney-client relationship and a breach of that relationship.  *See* Dkt. 43 ¶¶ 86–91. The Court previously dismissed Plaintiffs' legal malpractice claim for failing to adequately allege damages proximately caused by

Defendants' alleged misconduct. (Dkt. 40 at 19). In their amended pleading, Plaintiffs claim a loss of profits, decrease in control of the various Venture entities, dilution of Plaintiffs' equity, removal as directors and officers, payment of debt without contribution of Plaintiffs, and other business and opportunity costs resulting from Defendants' breaches of their duties owed to Plaintiffs. (Dkt. 43 ¶ 92). In a light favorable to the Plaintiffs, they have stated a cause of action for professional malpractice and the motions are due to be denied as to Count I.

B.      *Plaintiffs' Tort Claims Fail*

Under Virginia law, an attorney-client relationship is one of contract. *Oleyar v. Kerr*, 225 S.E.2d 398, 400 (Va. 1976) ("an action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract"). Accordingly, any torts committed in the course of an attorney-client relationship must be brought as breaches of the contractual duties—whether express or implied—of the lawyer because the contract is the sole source of duty in the relationship. *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 295 (Va. 2007) (dismissing a redundant tort claim because "[b]ut for the existence of the [contract], [the defendants] would [not] have owed any fiduciary duty to [the plaintiffs]"). Thus, any tort claims based on breaches of duties owed solely because of the attorney-client relationship must be dismissed. *See, e.g.*, *Delavan v. Simons*, 94 Va. Cir. 507 (Va. Cir. Ct. 2016) (dismissing claims for breach of fiduciary duty and

constructive fraud as being improperly brought as separate torts from the contractual legal-malpractice claim); *see also Atlas Partners II, Ltd. P'ship v. Brumberg, Mackey & Wall, PLC*, No. 4:05CV00001, 2006 WL 42332, at *8 (W.D. Va. Jan. 6, 2006) (dismissing claims for breach of fiduciary duty and fraud for the same reasons).

In Count II, Plaintiffs sue all Defendants for breach of fiduciary duty. As alleged, the breaches relate to performance of legal work for Defendants' own benefit and in conflict with and to the detriment of Plaintiffs. (Dkt. 40 ¶ 94). The duty arises from the legal work performed. *Id.* ¶ 97. Accordingly, any claim for breach of a fiduciary duty is subsumed by the professional malpractice claim and is not an independent cause of action. The motions to dismiss are due to be granted as to Count II.

In Count VI, Plaintiffs allege a claim for negligent misrepresentation. As stated previously, such tort claims are subsumed within the legal malpractice claim. Plaintiffs attempt to avoid this conundrum by alleging "[t]o the extent that the Court finds that the Defendants were not the Plaintiffs' counsel. . . ." (Dkt. 43 ¶ 132). The basis of the entire Amended Complaint, however, is the Kaplans' alleged misconduct in the legal representation of Plaintiffs. As pled by Plaintiffs, the genesis of the relationship was Kaplan Jr.'s efforts to have Stanton switch his legal business to Kaplan Jr.'s law firm. Once that was accomplished, the relationship continued to

grow through various business transactions, all the while with Kaplan Jr. and then

Kaplan serving as legal counsel, drafting documents, and providing legal advice.

The allegations in Count VI arise out of and relate to the legal work performed by

Defendants, the advice given, and the documents drafted. Thus, nothing about the

allegations of Count VI lead the Court to find that an attorney-client relationship did

not exist. "The Virginia Supreme Court has long held that 'an attorney may be

employed without formalities of any kind. The contract . . . is often largely implied

from the acts of the parties.'" *Atlas Partners II, Ltd. P'ship v. Brumberg, Mackey &

Wall, PLC*, No. 4:05CV00001, 2006 WL 42332, at *5 (W.D. Va. Jan. 6, 2006)

(quoting *Glenn v. Haynes*, 66 S.E.2d 509 (Va. 1951)). The alleged misconduct

relating to that relationship has been adequately raised in Count I, and therefore

Plaintiffs' tort claims in Counts II and VI that are based on the same core facts fail

as a matter of law.

### C.    *Plaintiffs' Fraud Claims*

Plaintiffs allege five variations of fraud against Defendants in the Amended

Complaint. In Counts III and IV, Plaintiffs sue the Kaplans for fraud and fraud in

the inducement. In Counts VII and VIII, Plaintiffs sue the Kaplans for fraudulent

omission and constructive fraud.  Count V alleges a claim against all Defendants for

civil conspiracy to defraud. "Where a person who happens to be an attorney engages

in conduct that breaches a duty which exists outside of the attorney-client

relationship, the client may bring tort claims seeking recompense for the damages caused by that conduct." *Hewlette v. Hovis*, 318 F. Supp. 2d 332, 336 (E.D. Va. 2004) (citing *Goodstein v. Weinberg*, 245 S.E.2d 140 (Va. 1978) (holding that a client can sue attorney in tort for fraud)).

This Court previously rejected Plaintiffs' claims of fraud in the inducement, constructive fraud, and fraudulent omission because Plaintiffs alleged the same misconduct that arose from the attorney-client relationship and therefore those claims were redundant of or subsumed by the professional malpractice claim. In the Amended Complaint Plaintiffs attempt to recast these fraud claims in a different light to avoid dismissal.

In Count IV, Plaintiffs allege that the Kaplans induced them into transacting business and falsely misrepresenting that they were serving as Plaintiffs' legal counsel. For the same reasons discussed above, Plaintiffs' allegations are internally inconsistent and fail to state an independent cause of action. Plaintiffs assert a claim for fraudulent inducement "to the extent that the Court finds that the Defendants were not the Plaintiffs' counsel." (Dkt. 43 ¶ 113). However, all of the remaining allegations, including those incorporated from paragraphs 1 through 85, belie a finding that Defendants were not acting as Plaintiffs' counsel. The ultimate criticism in Count IV mirrors the claims of professional malpractice, that is, that Plaintiffs have employed the Kaplans as their sole legal counsel and the Kaplans used that

relationship to make misrepresentations and provide legal advice that was to the benefit of the Kaplans and to the detriment of the Plaintiffs.

Counts VII and VIII suffer from the same pleading deficiencies. Plaintiffs seek a finding that the Kaplans were not serving as their counsel but incorporate all of the general allegations establishing the attorney-client relationship. Also, as this Court previously observed, Virginia law views claims for negligent misrepresentation and constructive fraud as the same cause of action. *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998). Plaintiffs' claims in Counts IV (fraudulent inducement), VII (fraudulent omission), and VIII (constructive fraud) are due to be dismissed as subsumed in the professional malpractice claim.[3]

This is not to say that Plaintiffs are barred from bringing any fraud claim. To the contrary, Virginia courts have recognized that "fraud is an independent, willful tort under Virginia law." *Hewlette*, 318 F. Supp. 2d at 337 (internal citations and quotation marks omitted). And "[t]he duty not to defraud is owed by everyone to everyone, regardless of any special relationship between the alleged tortfeasor and victim." *Id*. The elements of actual fraud, which must be shown by clear and

---

[3] In addition to these Counts being subsumed in Count I, it is worth noting that the allegations of the fraud Counts are redundant among themselves alleging much of the same misconduct and damages. Further, as discussed *infra*, these Counts fail to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) to state a claim for fraud.

convincing evidence, are: "(1) a false representation, (2) of a material fact, (3) intentionally and knowingly made, (4) with intent to mislead, (5) with reliance by the party misled, (6) and with resulting damage or injury to the misled party." *Howarth v. Rockingham Pub. Co*., 20 F. Supp. 2d 959, 970 (W.D. Va. 1998) (citing *Winn v. Aleda Constr. Co*., 315 S.E.2d 193 (Va. 1984)). In pleading a claim for fraud, a plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 9. Specifically, "under Rule 9(b), Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (citation omitted).

> Because fair notice is "[p]erhaps the most basic consideration" underlying Rule 9(b), Wright & Miller, supra, § 1298, at 648, the plaintiff who pleads fraud must "reasonably notify the defendants of their purported role in the scheme." *Midwest Grinding [Co. v. Spitz]*, 976 F.2d [1016, 1020 (7th Cir.1992)]. Therefore, in a case involving multiple defendants . . . "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio [v. Equidyne Extractive Indus., Inc*., 822 F.2d 1242, 1247 (2d Cir. 1987)].

*Brooks*, 116 F.3d at 1381 (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc*., 20 F.3d 771, 777–78 (7th Cir. 1994)).

Where, as here, Plaintiffs have sued three Defendants, Plaintiffs are obligated under Rule 9 to identify not only the precise statements and misrepresentations and when and where each were made, but also must identify which Defendant made what statement. Throughout Count III, Plaintiffs generally allege conduct by "the Kaplans," *see, e.g.,* Dkt. 43 ¶¶ 101 ("Kaplans' fraud"), 103 ("Kaplans had no intention of disclosing"),105 ("Kaplans implored"; "Kaplans counseled") or make blanket, nonspecific statements about "the Defendants" without identifying which of the three Defendants Plaintiffs are attributing the conduct. Such vague allegations fail to satisfy the heightened pleading requirements of Rule 9. Accordingly, Count III is due to be dismissed. The Court will permit Plaintiffs one more opportunity to amend their fraud claim in Count III to adequately identify the misrepresentations made, the Defendant responsible for making the statement, and each respective Defendant's role in the alleged fraud.

Because Plaintiffs' fraud claim fails, Plaintiffs' claim in Count V for civil conspiracy to defraud necessarily fails. Rule 9(b) requires fraud to be plead with particularity as to the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Terry v. SunTrust Banks, Inc*., 493 F. App'x 345, 358 (4th Cir. 2012) (citation omitted). The allegations in Count V do not satisfy this strict pleading requirement.

Notwithstanding the pleading deficiencies, Plaintiffs fail to state a claim for conspiracy. The Court previously dismissed Plaintiffs' conspiracy claim noting that in order to have a conspiracy, there must be two or more persons or entities involved. *See Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). The Kaplans are members and principals in the Kaplan firm and thus are not separate distinct entities. In an effort to overcome this fact, Plaintiffs allege in the Amended Complaint, that the Kaplans acted outside the scope of their role as partners in the firm. However, the Kaplan firm's liability is based on the theory of respondeat superior in that the firm is responsible for the conduct of its employees—the Kaplans. Plaintiffs fail to allege any independent misconduct by the firm separate from the actions of the Kaplans. "A plaintiff alleging conspiracy must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it." *Id.* at 357 (citation and internal quotation marks omitted). Plaintiffs fail to state ultimate facts to support a claim for conspiracy. Accordingly Count V is due to be dismissed.

## CONCLUSION

The Court grants in part Defendants' Motions to Dismiss (Dkts. 44, 45) and dismisses Counts II (breach of fiduciary duty), IV (fraud in the inducement), V (civil conspiracy to defraud), VI (negligent misrepresentation), VII (fraudulent omission),

and VIII (constructive fraud) with prejudice. The Court dismisses Count III (fraud) without prejudice. The Court denies the motions to dismiss (Dkts. 44, 45) as to the professional malpractice claim in Count I. If Plaintiffs choose to replead their fraud claim, they may file a second amended complaint within twenty (20) days of the date of this Order consistent with the rulings herein.

**DONE AND ORDERED** at Tampa, Florida, on December 12, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record